[No. 15494-3-II.  Division Two.  March 22, 1996.]
THE STATE OF WASHINGTON, *Respondent*, v. KEVIN FRANK HUDDLESTON, *Appellant*.

*Kevin F. Huddleston*, pro se; and *Lenell R. Nussbaum*, for appellant (appointed counsel for appeal).

*Russell D. Hauge, Prosecuting Attorney*, and *Pamela B. Loginsky, Deputy*, for respondent.

MORGAN, J. — After a bench trial, the trial court found Huddleston guilty of five counts of first degree assault. We remand for further proceedings.

On the night of August 5, 1991, a number of men and women were drinking at the Red Rooster Tavern in Bremerton, Washington. About 1:00 A.M., three of the women, Katie Beinert, Jennifer Chiles and Margaret Dotson, went outside to use the pay phone. While standing on the sidewalk near the pay phone, they noticed three men, later identified as Kevin Huddleston, Darrell Miller, and Norman Gonzales, walking toward them. Miller and Gonzales were wearing baseball hats, while Huddleston

was wearing a blue "Gilligan" hat, so described because of its resemblance to a hat worn on the TV show, *Gilligan's Island.*

As the three men passed, Miller collided with Beinert. The women swore and yelled racial slurs. Miller yelled obscenities in return. Beinert then went to the door of the tavern and called to her husband for assistance.

Timothy Beinert, William Dulyea, Jonathan Anderson, Robert Mosley, Michael Tears and others came out of the bar. They faced Miller, who had Gonzales and Huddleston behind him. Dulyea and Miller argued, and the situation escalated into a brawl. When the brawl subsided, Beinert had been stabbed in the back and chest; Dulyea in the stomach; Tears in the rib cage and buttocks; and Mosley in the liver. Mosley has had recurrent problems and several surgeries.

According to the State's witnesses, Huddleston wielded the knife. Anderson said Huddleston lunged at him with a knife and hit him in the stomach; Huddleston failed, however, to break the skin. Beinert said Huddleston stabbed him, and Anderson said he saw Huddleston backing away from Beinert with knife in hand. Dulyea, Tears and Mosley were unable to identify the person who had a knife. Gonzalez testified that neither he nor Miller had wielded the knife, leaving an inference that Huddleston had.

The State charged Huddleston with five counts of first degree assault. It alleged asssaults on Mosley, Beinert, Dulyea, Tears, and Anderson, respectively. It based each count on RCW 9A.36.011(1)(a), which provides:

> A person is guilty of assault in the first degree if he or she, with intent to inflict great bodily harm . . . [a]ssaults another with a firearm or any deadly weapon or by any force or means likely to produce great bodily harm or death.

Before trial, the State served a witness list that did not include Gonzales. On September 17, 1991, two days before trial, the State left an amended witness list in defense

counsel's pick-up box in the prosecutor's office. The amended list included Gonzales, but it was not received by defense counsel before the trial started.

A bench trial commenced on September 19, 1991. Huddleston argued mistaken identity. He did not argue self-defense or defense of others.

During trial, the State proposed to call Gonzales. Defense counsel objected on grounds Gonzales had not been timely endorsed as a State's witness. After noting that the defense was not claiming surprise with respect to the substance of Gonzales' testimony,[1] the trial court ruled that Gonzales could be called. The defense asked for time to conduct an interview, and the court granted that request.

At the end of the trial, the court rendered an oral opinion in which it rejected Huddleston's identity defense. It also discussed the phrase "great bodily harm," saying:

> I'm not going to go into the definition of great bodily harm, it's the same definition that I guess I've dealt with all the time, grievous bodily harm, and it's harm that's seriously painful or hard to bear.[2]

After trial, the court entered written findings of fact. Finding XXX stated:

> Based upon the nature of the injuries suffered and the acts of the defendant, the five assaults were committed with the intent to inflict great bodily harm. Mr. Beinert, Mr. Dulyea, Mr. Tears and Mr. Mosley actually suffered great bodily harm. The assaults were committed with a deadly weapon or by a force or means likely to produce great bodily harm or death.[3]

At sentencing, the court imposed five consecutive stan-

---

[1]Defense counsel acknowledged that the State had earlier provided reports showing that Gonzales was one of Huddleston's two companions. *See* Report of Proceedings at 288. Thus, defense counsel limited his objection to the fact that the State had not endorsed Gonzales as a witness until two days before trial.

[2]Report of Proceedings at 444-45.

[3]Clerk's Papers at 18-19.

dard range terms of 108 months each.[4] After finding that Huddleston was "[i]ndigent and has no ability to pay at anytime,"[5] the court ordered that he pay $100 to the crime victims' fund and $5,000 in restitution. The court waived reimbursement of court costs and appointed counsel's fees.

On appeal, Huddleston argues the trial court erred by convicting without sufficient evidence, and by not finding an essential element of each crime charged. He further argues that he received ineffective assistance from his trial attorney. Finally, he argues that the trial court erred by ordering him to pay various financial obligations, and by sentencing him to five consecutive prison terms.

## I

### SUFFICIENCY OF THE EVIDENCE

The first issue is the sufficiency of the evidence. Huddleston does not argue that the evidence is insufficient to support a finding that he was the one wielding the knife. He does argue, however, that the evidence is insufficient to support findings (a) that he used "any force or means likely to produce great bodily harm or death" and (b) that he acted "with intent to inflict great bodily harm." As a matter of law, he says, each of his convictions must be reduced to second degree assault.

Evidence is sufficient if any rational trier of fact could find each essential element of the crime beyond a reasonable doubt.[6] In applying this test, we take the facts and inferences in the light most favorable to the State.[7] At the times pertinent here, RCW 9A.04.110(4)(c) defined "great bodily harm" as

bodily injury which creates a probability of death, or which

---

[4]*See* RCW 9.94A.400(1)(b).

[5]Clerk's Papers at 27.

[6]*Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Ortiz*, 119 Wn.2d 294, 311-12, 831 P.2d 1060 (1992); *State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986); *State v. Green*, 94 Wn.2d 216, 220, 616 P.2d 628 (1980).

[7]*State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

causes significant serious permanent disfigurement, or which causes a significant permanent loss or impairment of the function of any bodily part or organ . . . .

At trial, the State produced evidence that Huddleston used a knife to stab or attempt to stab several persons in the back, chest or stomach. Several of the resulting wounds were initially thought to be life-threatening. One person needed several surgeries to repair the damage. A rational trier viewing this evidence in the light most favorable to the State could conclude that Huddleston used force likely to produce great bodily harm, and that he acted with intent to inflict great bodily harm. The evidence is sufficient to support the convictions.

## II

### FAILURE TO FIND AN ESSENTIAL ELEMENT

The second issue is whether the trial court failed to find an essential element of the crime charged. We ask (A) did error occur and (B) what remedy should apply?

### A

Before 1986, "great bodily harm" and "grievous bodily harm" meant

> any serious hurt or injury or a hurt or injury that is seriously painful or hard to bear. It need not be a permanent hurt or injury.[8]

Neither phrase was ever used in connection with first degree assault.[9] "Grievous bodily harm" was used in connection with second degree assault.[10] "Grievous bodily

---

[8]*See* 11 Washington Supreme Court Committee on Jury Instructions, Washington Practice: Washington Pattern Jury Instructions, § 2.04 (ed. 1977) (hereinafter former WPIC 2.04).

[9]Former RCW 9A.36.010; Note on Use, former WPIC 2.04; *compare* RCW 9A.36.011(1).

[10]Former RCW 9A.36.020(1)(b).

injury" was used in connection with duress.[11] "Great personal injury," "grievous bodily harm," and "great bodily harm" were used in connection with justifiable homicide.[12]

■ The 1986 Legislature was the first to use "great bodily harm" in connection with first degree assault.[13] At the same time, it used "substantial bodily harm" in connection with one type of second degree assault,[14] and "bodily harm" in connection with another type of second degree assault.[15] Carefully distinguishing among all three terms, it defined "great bodily harm" as

> bodily injury which creates a probability of death, or which causes significant serious permanent disfigurement, or which causes a significant permanent loss or impairment of the function of any bodily part or organ.[16]

It defined "substantial bodily harm" as

> bodily injury which involves a temporary but substantial disfigurement, or which causes a temporary but substantial loss or impairment of the function of any bodily part or organ, or which causes a fracture of any bodily part.[17]

And it defined "bodily harm" as

> physical pain or injury, illness, or an impairment of physical condition.[18]

These definitions took effect on July 1, 1988, and superseded the definitions found in prior case law.

[11]RCW 9A.16.060.

[12]RCW 9A.16.050; Note on Use, former WPIC 2.04; *State v. Milbradt*, 68 Wn.2d 684, 685-87, 415 P.2d 2, *cert. denied*, 385 U.S. 905 (1966); *State v. Bell*, 60 Wn. App. 561, 566, 805 P.2d 815, *review denied*, 116 Wn.2d 1030 (1991); *State v. Lewis*, 6 Wn. App. 38, 42-43, 491 P.2d 1062 (1971).

[13]RCW 9A.36.011(1).

[14]RCW 9A.36.021(1)(a).

[15]RCW 9A.36.021(1)(d).

[16]RCW 9A.04.110(4)(c).

[17]RCW 9A.04.110(4)(b).

[18]RCW 9A.04.110(4)(a).

Here, Huddleston was tried for five first degree assaults. An element of each assault was the intent to inflict great bodily harm. When ruling on whether Huddleston harbored this intent, the trial court failed to apply the current definition of "great bodily harm." Instead, it applied a definition once applicable to other crimes, but superseded in 1988. As Huddleston argues, this was error.

### B

The remaining question is what remedy should be applied.[19] According to the State, we should vacate the convictions and remand the case to the trial court. On remand, the trial court would have discretion to apply, to the evidence already heard, the correct definition of "great bodily harm." If, using the correct definition, the trial court found "great bodily harm" beyond a reasonable doubt, it would reenter the convictions. Otherwise, it would reduce the convictions or order other appropriate relief.

Huddleston objects to the State's remedy and proposes two of his own. In his opening brief, he argues that he is entitled to a new trial. In his reply brief, he argues that he is entitled to have this court reduce his convictions from first to second degree assault.

Huddleston is not entitled to have this court reduce his convictions. He would be entitled to that remedy if the evidence were insufficient to support convictions for first degree assault,[20] or if the trial court had acquitted him of

---

[19]The State does not argue that the error was cured by Finding of Fact XXX; waived by the defendant's failure to object during the delivery of the trial judge's oral opinion; or harmless. Nor would any of those arguments be successful.

[20]*Morris v. Mathews*, 475 U.S. 237, 246-47, 106 S. Ct. 1032, 89 L. Ed. 2d 187 (1986); *Burks v. United States*, 437 U.S. 1, 18, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978); *see also State v. Hutchins*, 73 Wn. App. 211, 218, 868 P.2d 196 (1994); *State v. Robbins*, 68 Wn. App. 873, 877, 846 P.2d 585 (1993); *State v. Ferreira*, 69 Wn. App. 465, 474, 850 P.2d 541 (1993); *State v. Carlson*, 65 Wn. App. 153, 165, 828 P.2d 30, *review denied*, 119 Wn.2d 1022 (1992).

first degree assault.[21] Neither, however, is the case here.

The problem, then, is whether we should order a new trial, or give the trial court discretion to apply the correct definition of "great bodily harm" to the evidence already heard. *United States v. Reeves*, 752 F.2d 995 (5th Cir.), *cert. denied*, 474 U.S. 834 (1985), *appeal after remand*, 782 F.2d 1323 (5th Cir.), *cert. denied*, 479 U.S. 837 (1986), is on point.[22] In that case, a district judge tried the defendant, without a jury, for "corruptly" endeavoring to obstruct or impede the due administration of the Internal Revenue Code. At the end of the trial, the judge announced and applied an erroneous definition of the term "corruptly." The appellate court reversed and remanded. It said, however: "We express no opinion on whether a new trial is necessary, but leave this to the sound discretion of the district court."[23]

On remand, the defendant requested a jury trial. The district judge denied the request and proceeded to apply the correct definition of "corruptly" to the evidence already in the record from the first trial. Finding that definition to be met beyond a reasonable doubt, the judge again convicted. The defendant appealed a second time,

[21]*Green v. United States*, 355 U.S. 184, 188, 78 S. Ct. 221, 2 L. Ed. 2d 199 (1957).

[22]Cases involving the mere absence of a finding are not on point, even though they tend to show that it is sometimes permissible to remand to a trial court for the entry of findings based on evidence already heard. *E.g.*, *State v. Alvarez*, 128 Wn.2d 1, 19, 904 P.2d 754 (1995); *State v. Wilks*, 70 Wn.2d 626, 628-29, 424 P.2d 663 (1967); *State v. Russell*, 68 Wn.2d 748, 751, 415 P.2d 503 (1966); *State v. Helsel*, 61 Wn.2d 81, 82-83, 377 P.2d 408 (1962); *State v. Austin*, 65 Wash. App. 759, 762, 831 P.2d 747 (1992); *State v. Souza*, 60 Wn. App. 534, 541, 805 P.2d 237, *review denied*, 116 Wn.2d 1026 (1991); *State v. Jones*, 34 Wn. App. 848, 851, 664 P.2d 12 (1983); *see also State v. Bynum*, 76 Wn. App. 262, 265-66, 884 P.2d 10 (1994), *review denied*, 126 Wn.2d 1012 (1995) (remand unnecessary when oral ruling sufficient to allow review). The absence of a finding may hinder review, but it does not, without more, show that the substance of the trial court's decision was infected by error. Here, the substance of the decision was infected by error, so we look for guidance to cases of that sort.

[23]*United States v. Reeves*, 752 F.2d 995, 1002 (5th Cir.), *cert. denied*, 474 U.S. 834 (1985), *appeal after remand*, 782 F.2d 1323 (5th Cir.), *cert. denied*, 479 U.S. 837 (1986).

and the appellate court affirmed, holding that the district judge had acted within his discretion.

■ *Reeves* is persuasive here. Thus, we reverse Huddleston's convictions and hold that the trial court, on remand, shall have discretion to follow either of two courses of action. If the court believes it can fairly do so, it may apply the correct definition of "great bodily harm" to the evidence previously presented, and reenter or reduce the convictions accordingly. If the court believes it cannot fairly make this application—perhaps, for example, because too much time has passed since it saw and heard the witnesses—it shall convene a new trial.

## III

### INEFFECTIVE ASSISTANCE OF COUNSEL

The next question is whether Huddleston was ineffectively assisted by trial counsel. The one asserting ineffective assistance has the burden of showing it.[24] To bear that burden, he or she must show, from the record, deficient performance plus prejudice.[25] To show deficient performance, he or she must show that given all the facts and circumstances, counsel failed to meet an objective standard of reasonableness.[26] To show prejudice, he or she must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[27] But he or she "need not show that counsel's deficient conduct more likely than not altered the outcome in the case."[28]

Huddleston argues that counsel was ineffective because he failed to argue self-defense and defense of others. He

---

[24]*State v. McFarland*, 127 Wn.2d 322, 337, 899 P.2d 1251 (1995).

[25]*Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *McFarland*, 127 Wn.2d at 334-35.

[26]*State v. McFarland*, 127 Wn.2d at 334-35.

[27]*Strickland*, 466 U.S. at 694; *McFarland*, 127 Wn.2d at 335; *State v. Thomas* 109 Wn.2d 222, 225-26, 743 P.2d 816 (1987).

[28]*Strickland*, 466 U.S. at 693.

also argues that counsel was ineffective because (1) counsel failed to realize that an identity defense would be weak if the State called Gonzales as a witness, and (2) counsel failed to seek a continuance when, during trial, counsel learned for the first time that Gonzales would be a State's witness. The State asks us to infer that the decision not to present self-defense or defense of others was tactical, because those defenses are inconsistent with the defense of identity. Huddleston replies that self-defense and defense of others were not inconsistent with an identity defense under the particular circumstances present here,[29] and that counsel's strategy was due to a lack of preparation or analysis.

The present record fails to provide an adequate basis for resolving these arguments, for it shows only what occurred during trial. It does not show why defense counsel opted not to argue self-defense or defense of others.[30] It does not show Huddleston's version of events.[31] Counsel's choice of defenses may have been tactical, as the State contends. On the other hand, it may have been negligent, as Huddleston contends. Given only the present record, it would be speculative to pick one assertion over the other, and speculation is not a proper basis for decision. Accordingly, resolution of these arguments must await the development of a full and complete record.[32]

Huddleston also argues that defense counsel was ineffective because he failed to object when, during the court's oral opinion, the court used the wrong definition of "great bodily harm." On remand, however, the trial court will

---

[29]Specifically, Huddleston says, "Defense counsel could argue the state failed to meet its burden of proving who the person was that bore the knife, and also argue alternatively that whoever bore the knife had a right to defend himself or his friend in light of the three men being outnumbered by eight or ten." Appellant's Reply Br. at 5.

[30]For obvious reasons, no one inquired into defense counsel's thought processes during trial.

[31]Huddleston elected not to testify at trial.

[32]See McFarland, 127 Wn.2d at 338 n.5.

apply the correct definition of "great bodily harm" or grant a new trial. Thus, assuming without holding that counsel's failure to object fell below an objective standard of reasonableness, there is no prejudice, and this argument fails.

## IV

### FINANCIAL OBLIGATIONS

■ Huddleston argues that the trial court erred by ordering him to pay a penalty assessment. Such an assessment is mandated by statute, however, and the statute is constitutional because other parts of the law prevent incarceration based on inability to pay.[33] The trial court did not err by imposing a penalty assessment.

Huddleston further argues that the trial court lacked statutory authority to set a total amount of restitution, given that he was clearly indigent. He relies on the third sentence of RCW 9.94A.142(1), which provides:

> The court should take into consideration the total amount of the restitution owed, the offender's present, past, and future ability to pay, as well as any assets that the offender may have.

He also may be relying on the first sentence of RCW 9.94A.142(2), which states:

> Restitution shall be ordered whenever the offender is convicted of an offense which results in injury to any person . . . unless extraordinary circumstances exist which make restitution inappropriate in the court's judgment and the court sets forth such circumstances in the record.

■ Neither of these sentences indicates that the trial court lacked statutory authority to order a total amount of restitution. Under the version of the statute in effect in 1991,[34] the third sentence of RCW 9.94A.142 states the factors the court is to consider when setting a *monthly pay-*

---

[33]RCW 7.68.035; *State v. Curry*, 118 Wn.2d 911, 918, 829 P.2d 166 (1992).

[34]Laws of 1989, ch. 252, § 6.

ment amount; it does not relieve the court of its obligation to set a *total amount* of restitution, subject to the offender's later ability to pay. Similarly, the "extraordinary circumstances" test embodied in the first sentence of RCW 9.94A.142(2) requires more than a mere showing of indigency.[35]

■ Finally, Huddleston argues that the trial court acted unconstitutionally when it ordered him to pay restitution. The restitution statute[36] is constitutional as applied to an indigent, because it and other statutes disallow incarceration based on inability to pay.[37] We conclude the trial court did not err by ordering a total amount of restitution, even though Huddleston was indigent.

## V

### CONSECUTIVE SENTENCING

■ In a pro se brief, Huddleston argues that the trial court erred by imposing consecutive sentences. It is apparent, however, that the trial court sentenced according to RCW 9.94A.400(1)(b).[38]

Reversed and remanded for further proceedings consistent herewith.

SEINFELD, C.J., and HOUGHTON, J., concur.

After modification, further reconsideration denied May 9, 1996.

Review denied at 130 Wn.2d 1008 (1996).

---

[35]*State v. Stuhr*, 58 Wn. App. 660, 665, 794 P.2d 1297 (1990), *review denied*, 116 Wn.2d 1005 (1991).

[36]RCW 9.94A.142.

[37]RCW 9.94A.142(1) (authorizing court to modify monthly payment schedule); RCW 9.94A.200; *State v. Bower*, 64 Wn. App. 808, 813, 827 P.2d 308, *review denied*, 119 Wn.2d 1016 (1992).

[38]*See also State v. Wilson*, 125 Wn.2d 212, 220-21, 883 P.2d 320 (1994) (assault of each victim a separate and distinct offense for purposes of RCW 9.94A-400(1)(b)).